*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0886**

Michael O'Byrne, et al.,
Appellants,

vs.

Spring Valley Mutual Insurance Company,
Respondent.

**Filed July 6, 2015
Affirmed in part and reversed in part
Hooten, Judge**

Fillmore County District Court
File No. 23-CV-12-141

David W. VanDerHeyden, VanDerHeyden Law Office, P.A., Rochester, Minnesota; and

Scott Wilson, Minneapolis, Minnesota (for appellants)

Paul Wocken, Willenbring, Dahl, Wocken & Zimmermann, PLLC, Cold Spring, Minnesota (for respondent)

Considered and decided by Halbrooks, Presiding Judge; Hooten, Judge; and Klaphake, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HOOTEN**, Judge

A fire of unknown origin destroyed the home of appellants, father and daughter insureds, and when respondent-insurer claimed that appellants breached the terms of the insurance policy and refused to provide coverage, appellants brought suit. The jury determined that appellants breached the policy and that neither was entitled to coverage. Appellants brought a post-trial motion claiming that they were entitled to $269,875 for their losses because respondent agreed to settle the dispute, but the district court denied their motion. Appellant-daughter requested that the district court grant her motion for judgment as a matter of law relative to the issue of whether she breached the policy. The district court granted her motion, but held that, because her father would receive the benefits of any proceeds paid to her, she was not entitled to recover under the insurance policy. Appellants now contest the district court's determination that the parties did not agree to settle and challenge the denial of recovery to appellant-daughter. In a related appeal, respondent challenges the district court's grant of judgment as a matter of law on behalf of appellant- daughter. Because the district court did not abuse its discretion in finding that respondent did not settle appellants' claim, but did err in granting judgment as a matter of law to appellant-daughter, we affirm in part and reverse in part, concluding that appellants are not entitled to any recovery against respondent.

## FACTS

In March 2011, a fire of unknown origin destroyed a house located at 724 Margaret Street in Chatfield. Appellants Allison Stoehr and her father, Michael O'Byrne,

were the named insureds on respondent Spring Valley Mutual Insurance Company's home insurance policy covering the house. Spring Valley refused to cover the loss, and O'Byrne and Stoehr brought a breach of contract claim against Spring Valley. A jury heard the following testimony at trial.

Bradley Kullot, a claims adjuster for Spring Valley, testified about his history with O'Byrne. Kullot stated that he was in charge of processing a previous claim that O'Byrne's wife filed with Spring Valley in April 2009 when a fire of unknown origin destroyed their home. Kullot was still working for Spring Valley two years later. When he learned that another one of O'Byrne's homes had caught fire, he stated, "I have got to get down to this fire and see what is going on" because of "the history that I had with Mr. O'Byrne with a previous fire." Following the fire's containment, Kullot proceeded to photograph as much of the house as he could. Kullot stated that when he took his photographs no one had removed any items from the house. In the following weeks, he returned to the house two more times to take more photographs.

After his initial investigation, Kullot requested that O'Byrne and Stoehr fill in the blank spaces on the proof-of-loss form that Spring Valley provided them so the two could detail their losses. Kullot also notified O'Byrne and Stoehr that they were not to remove any items from the property or disturb the wreckage because the cause of the fire was still being investigated. Kullot informed them that the two did not have to worry about any further damage to the house because Spring Valley had retained a third party to secure the property. After learning that the cause of the fire was still being investigated,

O'Byrne immediately proceeded to personally demolish the wreckage by operating a forklift and "ramming" it repeatedly into the house over the third-party agent's protest.

Kullot was informed that O'Byrne personally demolished the wreckage and soon after received O'Byrne and Stoehr's completed proof-of-loss form. On the form, O'Byrne and Stoehr claimed that the fire caused $270,375 in damage to their property, which included $30,100 of personal property located within the house. The $30,100 figure was hand-written on the proof-of-loss form, and attached to the form was a four-page list detailing more than 100 items of personal property that the two claimed were damaged by the fire. Kullot stated that after examining the wreckage, his own photographs, and Spring Valley's files regarding the fire, he "did not see much personal property in the house" and could not verify the existence of most of the personal property that O'Byrne and Stoehr claimed that the fire had damaged.[1] One month later, Spring Valley informed O'Byrne and Stoehr that Spring Valley would not cover their loss because it alleged that the two had breached the insurance contract by submitting a false proof-of-loss form in which they claimed damages for non-existent household property.

Stoehr testified next about her role in the alleged fraud. She first admitted that the property on which the house was located was titled solely in her name, and that as a named insured on the policy, she initiated this lawsuit against Spring Valley. But, she testified that her only role during the processing of the insurance claim was in signing the

---

[1] The jury later heard evidence that the items that O'Byrne and Stoehr claimed were damaged by the fire, such as a refrigerator, a stove, and other large household appliances, would not have been completely destroyed by this fire, and evidence of their existence following the fire would have remained.

4

proof-of-loss form "at the request" of O'Byrne. During cross-examination, counsel for Spring Valley asked Stoehr about her testimony and previous statements that her only role in the proof-of-loss statement was confined to signing the form:

> Q: Let me go down to the next item [on Exhibit 157 the proof-of-loss form] if you would be kind enough to look at that. Total amount claimed for household personal property. Do you see that?
> A: Yes.
> . . . .
> Q: Now you have testified both in your statement under oath and in your deposition before today that you didn't have any interest in any personal household property at [the property] on [March 3, 2011]. Isn't that true?
> A: Yes.
> Q: So none of the household personal property that was attached to 157, the itemized personal property household list, none of that property was your household personal property. Is that a fair statement?
> A: Yes.
> . . . .
> Q: By the way, all of the notations on the far right column in Exhibit 157, you did not participate in any way, shape, or fashion if I understand your pretrial testimony in coming to those amounts. Was that a fair statement?
> A: Yep. You asked me that earlier. Yes.
> . . . .
> Q: Would it be fair to say, Ms. Stoehr, that you made no effort in signing Exhibit 157 to determine the accuracy of the values of the personal property on those four pages that we just looked at?
> A: I did not participate in that.
> Q: And you made no attempt to determine the accuracy of that information. Isn't that true?
> A: True.
> Q: All right. Nor did you make any attempt to determine the accuracy of the amounts that we see on the proof of loss itself, the handwritten notations to the right. Would that be a fair statement as well?
> A: Yes.

On re-cross, Stoehr admitted that she signed her name immediately below a statement on the proof-of-loss form which indicated that the document's signer was representing to Spring Valley that all of the statements and figures on the document were "true."

After hearing from other witnesses not relevant to this appeal, the district court instructed the jury and provided the jury with a special verdict form. The special verdict form included the questions, "Did Michael O'Byrne breach the contract (the insurance policy) with Spring Valley Mutual Insurance Company?" and "Did Allison Stoehr breach the contract (the insurance policy) with Spring Valley Mutual Insurance Company?" After deliberating, the jury wrote "yes" on the special verdict form as to both questions. The special verdict form also included the question, "What were the dollar amounts of the following expenses and damage that were caused by the [March 3, 2011] fire[?]" On the line for damages resulting from loss of "[h]ousehold personal property," the jury wrote "0."

After the unfavorable verdict, O'Byrne and Stoehr alleged for the first time that Spring Valley had actually agreed to settle their claim, and they brought a post-trial motion to "enforce" a purported settlement agreement between the parties. During the trial, O'Byrne and Stoehr discovered that Spring Valley introduced a duplicate of their proof-of-loss form as a trial exhibit. But, Spring Valley's duplicate contained Kullot's signature above the "Adjuster's Signature" line, whereas the proof-of-loss form that

6

O'Byrne and Stoehr introduced at trial contained only their signatures.[2] They alleged that with Kullot's signature on this copy, Spring Valley had accepted their offer to settle the dispute for $269,875. The district court denied their motion, finding that Spring Valley never accepted their offer to settle because Kullot did not have the power to authorize a settlement on behalf of Spring Valley.

Stoehr brought a post-trial motion for judgment as a matter of law under Minn. R. Civ. P. 50.02, in which she requested that the district court hold that she did not breach the contract. The district court granted her motion, determining that she was an "innocent" co-insured and had not breached the contract. After determining that Stoehr did not breach the contract, the district court then had to determine if she could receive any proceeds as an innocent co-insured under the reasoning of *Hogs Unlimited v. Farm Bureau Mut. Ins. Co.*, 401 N.W.2d 381 (Minn. 1987). In *Hogs Unlimited*, our supreme court held that when a co-insured breaches an insurance policy but another co-insured does not participate in the breach and is therefore "innocent," the innocent co-insured "may recover [her] proportionate interest under the insurance policy," provided that "payment of the insurance proceeds to the innocent [co-insured] can be accomplished to deny, in a practical manner, any appreciable benefit to the guilty [co-insured]." 401 N.W.2d at 386. The district court conducted a post-trial hearing and received post-trial submissions but determined that Stoehr could not recover any insurance proceeds. The

---

[2] Kullot submitted a post-trial affidavit in which he claimed that he signed the proof-of-loss form two years after O'Byrne and Stoehr sent the form to Spring Valley and four days before trial was set to begin. He stated he signed it because Spring Valley's internal rules dictated that after reviewing the claim he sign the document, which he had not previously done.

7

district court reached its conclusion upon hearing that Stoehr no longer had an economic interest in the insurance proceeds. The district court found that Stoehr and O'Byrne had assigned their interests in any recovery from the lawsuit to Eastwood Bank to secure a mortgage that the bank held on another property owned by O'Byrne. The district court noted that because any money awarded to Stoehr would go to Eastwood Bank and be used solely to reduce O'Byrne's outstanding mortgage debt, there was no way to distribute proceeds to Stoehr without directly benefitting O'Byrne in violation of the *Hogs Unlimited* requirement that the "guilty" co-insured be denied any benefit from the distribution of insurance proceeds to an innocent co-insured.

O'Byrne and Stoehr appealed, challenging the district court's refusal to "enforce" the purported settlement agreement and the district court's determination that Stoehr could not receive any insurance proceeds without directly benefiting O'Byrne. Spring Valley filed a related appeal, challenging the district court's decision to grant Stoehr's motion for judgment as a matter of law.

## D E C I S I O N

### I.

O'Byrne and Stoehr contend that they reached a binding settlement agreement with Spring Valley in which they would relinquish all claims for any insurance proceeds from Spring Valley relating to the fire in exchange for $269,875. O'Byrne and Stoehr argue that the district court erred by not "enforcing" this settlement agreement.

A settlement agreement is a contract. *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 581–82 (Minn. 2010). If the parties dispute whether a contract exists, "the existence and

8

terms of a contract are questions for the fact finder." *Morrisette v. Harrison Int'l Corp.*, 486 N.W.2d 424, 427 (Minn. 1992). "[T]he surrounding facts and circumstances in the context of the entire transaction" are relevant to determining whether the parties formed a contract. *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 919 (Minn. App. 2008) (quotation omitted), *review denied* (Minn. Jan. 20, 2009). Forming a contract requires a specific and definite offer, acceptance of that offer, and consideration. *Id.* at 918.

When reviewing mixed questions of fact and law, appellate courts grant the district court's findings of fact "great deference" while remaining free to correct any erroneous legal conclusions. *Porch v. Gen. Motors Acceptance Corp.*, 642 N.W.2d 473, 477 (Minn. App. 2002), *review denied* (Minn. June 26, 2002).

O'Byrne and Stoehr contend that their decision to sign the proof-of-loss statement in May 2011 reflects a specific and definite offer to settle the insurance claim for $269,875. They argue that Kullot's decision to sign the document in February 2013 indicates that Spring Valley accepted this offer. This argument failed to persuade the district court, which found that Kullot did not have the power to authorize a settlement on behalf of Spring Valley since he was only a claims adjuster.[3] The district court noted that Kullot signed his name in the space for the claims adjuster to sign, but the proof-of-loss form also contained a signature line next to the words "Claim Approved by," and no

---

[3] The jury would normally decide this question of fact. But, Stoehr and O'Byrne waited until after trial to bring their claim, and they requested a new trial to litigate this issue. The district court denied their motion for a new trial and then denied their claim on the merits. O'Byrne and Stoehr do not appeal the district court's denial of their motion for a new trial. Accordingly, the district court is the fact finder with respect to this issue.

9

one's signature appeared on this line. To further support its conclusion, the district court examined the 2009 proof-of-loss form relating to O'Byrne's previous fire, and the district court noted that the 2009 form contained a claims adjuster's signature and the additional signature of the manager-president of Spring Valley on the "Claims Approved by" line when Spring Valley agreed to cover the loss. Finally, the district court rejected O'Byrne and Stoehr's argument after noting that "all of the evidence at our trial made it abundantly clear" that Spring Valley did not intend to settle the dispute.

O'Byrne and Stoehr argue that the district court erred in its conclusion because "[a]ll of the extrinsic circumstances considered by the [d]istrict [c]ourt . . . are beside the point" and cannot be considered when the district court is interpreting "an unambiguous fully integrated agreement" that indicated that Spring Valley agreed to settled the dispute. Their argument fails for two reasons.

First, the district court's finding that Kullot did not have the power to bind the company was based on its examination of the document itself; the district court did not need to rely on any "extrinsic circumstances" in reaching its conclusion. The district court examined the proof-of-loss form and saw Kullot's signature next to the blank for the adjuster's signature, but the form did not contain a signature next to the "Claim Approved by" line. The district court did not clearly err in finding that Spring Valley did not accept the offer without this additional signature, and O'Byrne and Stoehr put forth no argument on appeal that Kullot actually had the power to bind Spring Valley. Absent some compelling evidence to the contrary, which O'Byrne and Stoehr failed to provide,

10

we will not disturb the district court's finding of fact that Spring Valley did not accept the offer to settle because Kullot lacked the authority to authorize the settlement agreement.

Second, the district court *was permitted* to consider extrinsic circumstances to bolster its analysis of the document itself in determining whether the proof-of-loss form was a settlement contract, and O'Byrne and Stoehr do not actually challenge these findings. The district court was not interpreting an unambiguous contract and therefore it was not confined to examining the four corners of the document as O'Byrne and Stoehr suggest. O'Byrne and Stoehr asked the district court to find that this document was a contract. Spring Valley argued it was not. Since the parties disputed whether a contract existed, the question of whether a contract existed between the parties was for the district court sitting as the fact finder to decide. *See Morrisette*, 486 N.W.2d at 427. Therefore, the district court was permitted to examine the "surrounding facts and circumstances in the context of the entire transaction" to determine whether a contract was formed. *Olson & Associates*, 756 N.W.2d at 919 (quotation omitted). O'Byrne and Stoehr do not assert that the district court erred in its analysis of the previous proof-of-loss form or the parties' conduct at trial; they simply asserted that the district court could not rely on these "extrinsic factors." Since the district court was permitted to rely on these factors, we see no reason to scrutinize the findings that the district court drew from the extrinsic circumstances when O'Byrne and Stoehr do not challenge what the district court found.

## II.

In its related appeal, Spring Valley challenges the district court's decision to grant Stoehr's motion for judgment as a matter of law over the jury's finding that she breached

11

the insurance contract. Spring Valley argues that it presented evidence that could have allowed a jury to find that Stoehr breached the contract. We agree.

Appellate courts review a district court's decision to grant judgment as a matter of law de novo. *Pouliot v. Fitzsimmons*, 582 N.W.2d 221, 224 (Minn. 1998). Judgment as a matter of law should be granted "only in those unequivocal cases" when the district court is duty-bound to set aside a verdict because it is "manifestly against the entire evidence" or "contrary to the applicable law of the case." *Moore v. Hoff*, 821 N.W.2d 591, 595 (Minn. App. 2012) (quotation omitted). Appellate courts will affirm a jury's answer on a special verdict form unless the answer "is perverse and palpably contrary to the evidence, or where the evidence is so clear as to leave no room for differences among reasonable persons." *Moorhead Econ. Dev. Auth. v. Anda*, 789 N.W.2d 860, 888 (Minn. 2010) (quotation omitted). If multiple answers on a special verdict form "can be reconciled on *any* theory" consistent with the evidence and fair inferences drawn from that evidence, "the verdict will not be disturbed." *See Dunn v. Nat'l Beverage Corp.*, 745 N.W.2d 549, 555 (Minn. 2008) (quotation omitted). When considering a motion for judgment as a matter of law, the evidence must be viewed in the light most favorable to the party that prevailed at trial. *Pouliot*, 582 N.W.2d at 224.

At trial, Spring Valley argued that Stoehr and O'Byrne breached the insurance contract by violating the clause in the policy stating that they would not "willfully and with intent to defraud after a loss . . . misrepresent[] . . . a material fact or circumstance that relates to this insurance." Spring Valley's theory was that O'Byrne and Stoehr falsely represented that the *value* of the items that the fire damaged was $30,100, and

12

O'Byrne and Stoehr further falsely represented that they *had actual knowledge* that the $30,100 figure was accurate and "true." Spring Valley argued that O'Byrne and Stoehr made these knowing and false misrepresentations with the "intent to defraud" because if Spring Valley relied on O'Byrne and Stoehr's statements about the value of the property, and their representations that they knew that this value was "true," Spring Valley would pay out $30,100 in insurance proceeds to which the two were not entitled.

The evidence viewed in the light most favorable to the verdict shows that O'Byrne completed the proof-of-loss form indicating that the fire damaged more than 100 items of household property worth $30,100 when the actual damage to the household property was $0, as reflected on the jury's special verdict form. The evidence demonstrated that Stoehr signed the proof-of-loss form immediately below a line that indicated that all of the statements and figures contained on the form were "true." The evidence demonstrated that Stoehr did nothing to investigate the accuracy of the figures on the form and that Stoehr knew that she did not know whether the figures were accurate.

The district court examined this evidence, but it concluded that this evidence could not have persuaded the jury that Stoehr intended to defraud Spring Valley. The district court determined that this evidence could persuade a jury that Stoehr willfully made a material misrepresentation when she signed her name without knowing whether *the value* of the $30,100 claimed loss was accurate. But, the district court concluded that the evidence could not persuade a jury that Stoehr intended to defraud Spring Valley because (1) Stoehr's role "constituted . . . nothing more sinister than her intent to simply comply with her father's request that she sign the Proof of Loss," (2) the jury was not permitted

13

to "indulge" an inference of fraudulent intent from Stoehr's mere misrepresentation, and (3) Stoehr unknowingly misrepresented *the value* of the items destroyed by the fire because "she did not know" whether the $30,100 figure was "true or false," and the insurance contract does not define an unknowing misrepresentation as fraud.

We reverse for three independently sufficient reasons: (1) the district court erred by applying the wrong standard of review when it failed to consider that the jury's answers on the special verdict could be reconciled, (2) the district court erred by applying the wrong standard of review when it did not consider all of the fair inferences that the jury may have derived from the evidence, and (3) the district court erred when it overlooked that the jury could have concluded that Stoehr intended to defraud Spring Valley by knowingly misrepresenting that she had actual knowledge when she knew that she did not have this knowledge.

First, the jury's answers on the special verdict form that O'Byrne and Stoehr each breached the contract are not inconsistent. The district court therefore erred in disturbing the jury's finding that Stoehr breached the contract because the answers can be "reconciled." *See Dunn*, 745 N.W.2d at 555 (quotation omitted). The testimony of O'Byrne, Stoehr, and Kullot could have persuaded the jury that O'Byrne intended to defraud Spring Valley because he prepared a document in which he falsely claimed that the fire destroyed $30,100 in household property that did not exist. On appeal, no one disputes that O'Byrne intended to defraud Spring Valley. But Stoehr testified that, even though she was a co-insured and brought this action, and even though the property on

14

which the house was located was titled in her name, she did not actively participate in O'Byrne's fraudulent scheme.

The district court stated that this evidence showed only that Stoehr's role "constituted . . . nothing more sinister than her intent to simply comply with her father's request that she sign the Proof of Loss." This may have been the district court's view of the evidence, but the jury expressly found that Stoehr breached the contract. Combined with its finding that O'Byrne breached the contract, a finding no one challenges, these answers can be reconciled because the jury simply may not have believed Stoehr and decided instead that she actively participated in O'Byrne's scheme. Our courts have long held that when a party moves for judgment as a matter of law, the jury has the "exclusive" right to assess the credibility of witnesses, and the district court may not interfere with that right. *McKenzie v. Siegel*, 261 Minn. 299, 302, 112 N.W.2d 353, 355 (1961). This respect for the fact finder's determination is so strong that the fact finder does not need to accept even uncontradicted testimony. *Costello v. Johnson*, 265 Minn. 204, 211, 121 N.W.2d 70, 76 (1963). The jury heard evidence that the property on which the house was located was titled in Stoehr's name, that she was a co-insured on the property, and that she initiated this lawsuit with O'Byrne. The jury could have used this evidence to infer that Stoehr actively participated in the fraudulent scheme. The district court erred therefore in granting Stoehr judgment as a matter of law when it did not consider that the jury's answers that each party breached the contract could easily be reconciled. *See Dunn*, 745 N.W.2d at 555.

15

Second, the district court erred by applying the wrong standard of review because it did not consider the evidence in the light most favorable to the verdict when it expressly denied the jury the right to draw inferences from the evidence it heard at trial. *See id.* The district court stated that the jury was not permitted to "indulge" the inference that Stoehr intended to defraud Spring Valley based on her admission to making a false misrepresentation on the proof-of-loss form. The district court did not cite any authority for this conclusion and it is erroneous. Fraudulent intent may be inferred from a misrepresentation because it is "difficult, if not impossible, directly to prove the mental state or undisclosed intent of a person. Hence in most cases fraudulent intent and bad faith must be proved by circumstantial evidence—by reasonable inferences drawn from facts and circumstances shown." *Weese v. Weese*, 191 Minn. 526, 530, 254 N.W. 816, 818 (1934). Not only was the jury permitted to infer Stoehr's "intent to defraud" from her misrepresentation, the district court was required to consider this "fair inference[]" that could be drawn from the evidence when it analyzed Stoehr's motion. *See Dunn*, 745 N.W.2d at 555 (quotation omitted). Because the district court applied the wrong standard of review when it discounted the possibility that the jury may have inferred a fraudulent motive from Stoehr's admitted misrepresentation, the district court erred in granting Stoehr judgment as a matter of law.

Finally, the district court erred when it stated that because Stoehr did not know whether the $30,100 figure was "true or false," the jury heard no evidence of Stoehr's "intent to defraud" because an unknowing misrepresentation does not demonstrate "intent to defraud." Even if we accept Stoehr's argument and the district court's implicit

16

determination that the parties contracted away the common law definition of fraud by using the phrase "intent to defraud," the district court still erred. The district court overlooked that the evidence could have persuaded the jury that Stoehr intended to defraud Spring Valley apart from her unknowing misrepresentation about the *value* of the items destroyed; the jury heard evidence that could have persuaded it that Stoehr knowingly misrepresented that she had *knowledge* which *she knew that she did not possess*.

Stoehr's theory is that "the only evidence in this case that could possibly come anywhere near 'intent to defraud' is that Allison Stoehr signed the proof of loss . . . without conducting an investigation" into the value of the property. Stoehr asserted that she was, at worst, guilty of what some have called "reckless misrepresentation" because she did not know whether the $30,100 figure was true or not. *See Florenzano v. Olson*, 387 N.W.2d 168, 177 n.1–2 (Minn. 1986) (Simonett, J., concurring specially) (distinguishing "deceit . . . where the represener knows his representation is false" from "reckless misrepresentation . . . when the represener asserts a fact as of his own knowledge without knowing whether it is true or false"). Stoehr argued that while reckless misrepresentation is "fraud" under the common law, reckless misrepresentation cannot support a finding of "intent to defraud" here because the parties contracted away the common law definition. The district court accepted Stoehr's argument and concluded that the jury heard no evidence of Stoehr's "intent to defraud" because "at worst, [Stoehr] made the misrepresentations 'when she did not know if they were true or false.'"

The fact that Stoehr testified that she did not know *the value* of the household property destroyed by the fire certainly supports a finding that she recklessly misrepresented *the value* of the household items that were damaged by the fire. *See Florenzano*, 387 N.W.2d at 177 n.2. But the district court and Stoehr overlooked that the jury heard evidence that could have persuaded it that Stoehr made another misrepresentation. Stoehr signed her name immediately below a statement stating that all of the statements and figures on the form were "true." The jury therefore heard evidence that could have persuaded it that Stoehr knowingly represented that she had actual knowledge that the $30,100 figure was accurate. But, Stoehr testified that not only did she not know whether household items were worth $30,100, she *knew that she did not know* what the items were worth and "had no way to know the accuracy" of the figures listed on the proof-of-loss form. Yet she still signed the form, and the jury could have concluded that she represented that she *knew* that the $30,100 figure was "true." Therefore, the jury could have inferred that Stoehr affirmatively, unequivocally, and falsely represented that she had actual knowledge when she knew that she did not have that knowledge. Therefore, even if we accept Stoehr's argument that the parties contracted away the common law definition of "intent to defraud" and used the term to refer to a knowing misrepresentation, the jury could have concluded that she intended to defraud Spring Valley under her interpretation when Stoehr falsely represented that she had knowledge that she knew she lacked.

This is a subtle distinction, but it is important to remember the context in which Stoehr made the false statement that she knew to be false. When processing insurance

18

claims, Spring Valley must rely on the insureds' superior knowledge about the value of the items that they claim are destroyed. The proof-of-loss form is the very mechanism by which Spring Valley assesses these values. If Spring Valley had not discovered this knowingly, false misrepresentation, it would have paid Stoehr and O'Byrne $30,100 in insurance proceeds to which Stoehr and O'Byrne were not entitled. Under Stoehr's interpretation and the district court's conclusion, an insured would be free to ignorantly sign documents and receive money to which she is not entitled even if she were *aware of her ignorance* and *falsely* asserted that she had the knowledge that she knew she lacked. We think that any reasonable interpretation of the contract's phrase "intent to defraud" prevents insureds from engaging in this kind of behavior while still recovering under the policy.

We reverse the district court's grant of judgment as a matter of law since the verdict was not "manifestly against the entire evidence." *See Moore*, 821 N.W.2d at 595 (quotation omitted). Because the district court erred in granting Stoehr's motion for judgment as a matter of law, we do not consider Stoehr's appeal of the district court's determination that she cannot recover her proportionate interest of the proceeds without directly benefiting O'Byrne. Because we reinstate the jury's verdict that she breached the insurance contract, she cannot receive coverage related to this loss.

**Affirmed in part and reversed in part.**

19